Filed 1/8/15  Lane v. Bell CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| JOHN LANE et al., | D064651 |
| Plaintiffs and Respondents, | |
| v. | (Super. Ct. No. 37-2013-00034878-CU-MC-CTL) |
| JOAN BELL et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of San Diego County, Ronald S. Prager, Judge.  Affirmed.

Suppa, Trucchi & Henein, Samy Henein and Raymond Lee for Defendants and Appellants.

Wicks Law, Rory Richard Wicks; Veta & Veta and Ross E. Veta for Plaintiffs and Respondents.

In 2011, John and Denise Lane (together the Lanes) filed a lawsuit (the property action) against Denise's mother, Joan Bell.  Bell's cross-complaint in the property action alleged, among other claims, that the Lanes were liable for elder abuse and intentional

infliction of emotional distress.  The trial court in the property action ultimately granted the Lanes' motion for nonsuit as to Bell's claims for elder abuse and intentional infliction of emotional distress.  In the present action, the Lanes' complaint alleged Bell and her attorneys (together defendants) were liable for maliciously prosecuting Bell's claims in the property action insofar as Bell asserted claims against the Lanes for elder abuse and intentional infliction of emotional distress.

Defendants moved to strike the malicious prosecution lawsuit pursuant to Code of Civil Procedure[1] section 425.16, commonly referred to as the anti-SLAPP (strategic lawsuit against public participation) statute.  (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 57.)  The trial court denied the motions to strike, concluding that although defendants made a prima facie showing the Lanes' malicious prosecution lawsuit was based on protected speech, the Lanes carried their burden of showing a potential for success on the merits as to both Bell and her attorneys.  Defendants timely appealed.

---

[1]    All statutory references are to the Code of Civil Procedure unless otherwise specified.

# I

## FACTUAL BACKGROUND[2]

### A. The Initial Relationship

In 1987, Mr. Lane acquired a parcel of land (the land) at a tax auction with the apparent intent that Bell and her husband would ultimately buy the land from the Lanes for use as a retirement property. However, Bell and her husband subsequently told the Lanes they could not purchase the land. Instead, in 1989, the Lanes agreed to sell Bell and her husband an undivided one-half interest in the land, and accepted as consideration for that sale a promissory note from Bell and her husband in the amount of $40,000, which was interest free and contained no time for payment.

Concurrently with the sale of the undivided one-half interest in the land, the Lanes and Bell also entered into a Joint Venture Agreement (JVA) defining the parties' planned responsibilities and rights with respect to the land. Under the JVA, the parties agreed to try to obtain approval for a lot split of the land that, if successful, would result in Bell

---

2    We base our factual summary on the allegations of the complaint and the evidence presented in the anti-SLAPP proceedings. We view these facts most favorably to the Lanes, who opposed the anti-SLAPP motion. Although our factual recitation may not reflect what will be ultimately proved at trial, the "minimal merit" prong of the anti-SLAPP statute (see *Navallier v. Sletten* (2002) 29 Cal.4th 82, 95, fn. 11) requires that we evaluate the opposing parties' showing in a manner analogous to the showing required in opposition to a motion for nonsuit (*1-800 Contacts, Inc. v. Steinberg* (2003) 107 Cal.App.4th 568, 584-585), which requires we view the facts most favorably to the party opposing the motion. (*Mechanical Contractors Assn. v. Greater Bay Area Assn.* (1998) 66 Cal.App.4th 672, 677 [motion for nonsuit concedes truth of the facts proved and may grant a nonsuit only when " 'disregarding conflicting evidence, viewing the record in the light most favorable to the plaintiff and indulging in every legitimate inference which may be drawn from the evidence, it determines there is *no* substantial evidence to support a judgment in the plaintiff's favor' "].)

owning the upper lot and the Lanes owning the lower lot. The Lanes were to be responsible for processing the application for the lot split, and the parties would divide equally the associated costs and common expenses for the land. During the processing of the proposed lot split, the parties also agreed Bell would begin building a residence on the portion of land that would become the upper parcel. The parties also agreed, should the lot split be denied, to grant each other a right of first refusal to purchase the other's interest in the land.

Bell moved onto the upper lot in 1989 and lived on the land in a recreational vehicle (RV) through 2010. However, Bell never commenced building a permanent residence and, although the Lanes did everything required of them under the JVA, including undertaking the activities required to accomplish the lot split, the Lanes were unable to effectuate a lot split because sometime between 1991 and 1993 the County of San Diego enacted a "Save the Forest Act" that precluded the lot split.

B. The Relationship Deteriorates

Around 1996 the Lanes told Bell they wanted to build a vacation home on the lower lot. The parties agreed to modify the JVA to provide that Bell would be allowed to maintain a temporary residence on the upper lot until such time as a lot split could be accomplished.

In 2008, Bell was informed by government officials that she needed to perform expensive "brush abatement" around her temporary residence on the upper lot. Bell instead elected to move her RV to the lower lot because the Lanes had assured her she would have access to electricity, water and septic on the lower lot, and Bell conceded at

4

trial that she had access to electricity, water and septic on the lower lot after she moved her RV, and no one cut off that access. However, the Lanes cautioned Bell that this temporary location would only be available for one year. Bell's entire family helped remove the deck around her RV when she relocated her trailer to the lower lot, and also helped re-install the deck after the move.

By late 2009 or early 2010, it had become clear to the Lanes that the original plans submitted to the county for their vacation home, which contemplated inclusion of a granny flat with a separate kitchen, would not be approved, and therefore the plans had to be modified to delete the extra kitchen. When the Lanes told her of the necessity for deleting a separate granny flat, Bell was sad. She believed she would be living in the granny flat once the residence was completed. Around the same time frame, Bell was contemplating moving out of state and asked the Lanes what she needed to do regarding the land in the event she died and, in response, the Lanes sent Bell a quitclaim deed for her to sign.

Shortly thereafter, Bell went to a friend, Mr. Suppa, for help. Suppa was of counsel to the law firm of Suppa, Trucchi and Heinen (Law Firm), which represented Bell in the underlying action. Suppa and Bell went to Mr. Lane's office without an appointment and Suppa told Mr. Lane he was representing Bell and wanted to speak to Mr. Lane about Bell's situation. Suppa loudly yelled accusations and demands at Mr. Lane, stating Bell was entitled to the house, she should live there, and she wanted a quarter of a million dollars for the Lanes' treatment of her. Suppa also stated he was

5

going to "ruin you financially," "I am going to ruin you personally," and "I will get you on elder abuse charges."

By late October 2010, the residence had been sufficiently completed and the Lanes faced a deadline for obtaining a certificate of occupancy. The Lanes requested the county issue that certificate and, as a condition for issuing that certificate, the county's building department instructed SDG&E to disconnect the panel serving the temporary dwelling units, which apparently included Bell's RV. Bell eventually moved away from the land.

During this same period, the parties negotiated a "buy-out" agreement under which they agreed to dissolve the JVA, hire an appraiser to value the land, and have the Lanes purchase Bell's interest in the land. As part of that agreement, the Lanes agreed to pay $25,000 to Bell as an "advance" against her partition value, and Bell was obligated to move from the lower lot pending the ultimate buy-out. The appraisal valued the land at around $500,000. Several months later, Ms. Trucchi of the Law Firm demanded settlement in the amount of $235,000. The Lanes' attorney rejected the offer, demanded payment of the amounts due from Bell to the Lanes under the JVA, and offered to settle all matters by paying Bell another $25,000.

C. The Underlying Property Action

Two months later, the Lanes filed the property action against Bell. They pleaded claims for breach of contract, negligent misrepresentation, breach of the promissory note, and three causes of action seeking to quiet their title against Bell's claims. In reply, Bell filed her cross-complaint in the property action alleging claims for breach of contract,

6

violation of the implied covenant of good faith, elder abuse, fraud, intentional infliction of emotional distress, and partition.

After discovery was completed, and before trial commenced, the Lanes' attorney warned Bell's attorneys that no evidence existed to support her pleaded causes of action alleging elder abuse and intentional infliction of emotional distress, and urged them to dismiss those claims.[3] In April 2012, a couple of months before trial was to commence, the Lanes' attorney corresponded with Bell's attorney, stating "I again caution you and your client not to proceed down this path. You and your client both know, which we can prove, that you have no evidence whatsoever supporting your client's claim for elder abuse. This cause of action is frivolous, malicious and unconscionable. I hope you realize this and agree to dismiss it now before this escalates any further. Without waiving attorney/client privilege, I caution you that I will advise my clients to pursue a malicious prosecution claim against you and your client once we prevail on this matter. I again request that you dismiss this cause of action."

Bell did not dismiss her claims for elder abuse and intentional infliction of emotional distress. At trial, the court granted the Lanes' nonsuit motion as to those claims. The jury found in favor of the Lanes on Bell's claims for breach of contract and breach of the implied covenant of good faith and fair dealing and found in favor of the Lanes on their claim for breach of the JVA and awarded them damages of $40,753.80.

---

[3] The Lanes propounded form interrogatories, requests for admissions and document production, special interrogatories, and depositions. Bell never identified any evidence supporting her claims for elder abuse or intentional infliction of emotional distress.

7

The jury also found in favor of the Lanes on Bell's claim for fraud, finding that the Lanes had performed the promises they had made to her. The court also granted the parties' request for partition and awarded the land to the Lanes with an offset owed to Bell.

D. The Current Malicious Prosecution Action

The Lanes filed the present action alleging Bell and the Law Firm maliciously prosecuted the claims for elder "financial" abuse, elder "care custodian" abuse, and intentional infliction of emotional distress. The Lanes' malicious prosecution action alleged (1) the allegations pleaded in support of those claims were false and defendants had no honest, reasonable or good faith belief the allegations were true, (2) defendants acted with malice, and (3) the trial court had granted nonsuit as to those claims. Defendants brought a motion to strike the complaint under the anti-SLAPP statute. The Lanes opposed the motion, asserting there had been a favorable termination of these claims by virtue of the nonsuit, the underlying proceedings showed defendants did not have probable cause either to initiate or to continue prosecuting those claims, and there was evidence of malice. The trial court found, although defendants made a prima facie showing the Lanes' lawsuit was within the ambit of the anti-SLAPP statute, the Lanes' opposition to the motion to strike carried their burden of providing sufficient proof that, if credited, would show all of the requisite elements to succeeding on the malicious prosecution claim. The court denied the motion, and also denied a request for reconsideration. The defendants now appeal denial of their anti-SLAPP motion.

8

III

THE ANTI-SLAPP LAW

The anti-SLAPP law provides that "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).)  The purpose of the statute is to encourage participation in matters of public significance by allowing a court to promptly dismiss unmeritorious actions or claims brought to chill another's valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances.  (*Id.,* subd. (a).)

The anti-SLAPP law involves a two-step process for determining whether a claim is subject to being stricken.  In the first step, the defendant bringing an anti-SLAPP motion must make a prima facie showing that the plaintiff's suit is subject to section 425.16 by showing the defendant's challenged acts were taken in furtherance of his or her constitutional rights of petition or free speech in connection with a public issue, as defined by the statute.  (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 733.)

When defendants satisfy the first step, the burden shifts to the plaintiff to demonstrate there is a reasonably probability the plaintiff will prevail on the merits at trial.  (§ 425.16, subd. (b)(1).)  In this phase, the plaintiff must show both that the claim is legally sufficient and there is admissible evidence that, if credited, would be sufficient to sustain a favorable judgment.  (*Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809, 823,

disapproved on other grounds by *Equilon Enterprises v. Consumer Cause, Inc., supra,* 29 Cal.4th at p. 68, fn. 5.; *Robertson v. Rodriguez* (1995) 36 Cal.App.4th 347, 358.) In making this assessment, the court must consider both the legal sufficiency of, and the evidentiary support for, the pleaded claims, and may also examine whether there are any constitutional or nonconstitutional defenses to the pleaded claims that would defeat the plaintiff's claims as a matter of law. (*Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005) 133 Cal.App.4th 658, 675-676.)

In considering whether a plaintiff has met his or her evidentiary burdens, the court must consider the pleadings and the evidence submitted by the parties. (§ 425.16, subd. (b)(1).) However, the court cannot weigh the evidence (*Looney v. Superior Court* (1993) 16 Cal.App.4th 521, 537-538) but instead must simply determine whether the plaintiff's evidence would, if credited, be sufficient to meet the burden of proof. (*Wilcox v. Superior Court, supra,* 27 Cal.App.4th at pp. 823-825 [standard for assessing evidence is analogous to standard applicable to motions for nonsuit or directed verdict].) On appeal, we review de novo the trial court's ruling on the motion to strike. (*Bernardo v. Planned Parenthood Federation of America* (2004) 115 Cal.App.4th 322, 339.)

IV

ANALYSIS

The parties do not dispute defendants made the requisite prima facie showing that the Lanes' suit was subject to section 425.16 because defendants' challenged acts were taken in furtherance of protected rights. (*Daniels v. Robbins* (2010) 182 Cal.App.4th 204, 215 ["every claim of malicious prosecution is a cause of action arising from

10

protected activity because every such claim necessarily depends upon written and oral statements in a prior judicial proceeding"] (*Daniels*).)  Instead, the question presented here relates to the second step of the anti-SLAPP inquiry, and requires that we examine whether the Lanes met their burden of establishing there were facts presenting a prima facie case for prevailing on the merits.  Our examination of each of the elements of a malicious prosecution claim persuades us the Lanes showed there was admissible evidence that, if credited, would be sufficient to sustain a favorable judgment.

A. Malicious Prosecution

Three elements must be pleaded and proved to establish the tort of malicious prosecution: (1) A lawsuit was commenced by or at the direction of the defendant that was pursued to a legal termination in plaintiff's favor; (2) the prior lawsuit was brought or maintained without probable cause; and (3) the prior lawsuit was brought with malice. (*Citi-Wide Preferred Couriers, Inc. v. Golden Eagle Ins. Corp.* (2003) 114 Cal.App.4th 906, 911.)  We must determine whether the Lanes' evidence, if credited, would satisfy each element.  (*Daniels, supra,* 182 Cal.App.4th at p. 216.)

*Favorable Termination*: The claims underlying the malicious prosecution action were Bell's claims for elder abuse (of both the "financial" and "care custodian" variety) and for intentional infliction of emotional distress.  Each of those claims were dismissed by nonsuit.  Accordingly, the Lanes provided evidence that satisfied the first element.

*Absence of Probable Cause to Initiate or Maintain the Claims*: The probable cause element of a malicious prosecution action requires an objective judicial determination of the "reasonableness" of the defendant's prior lawsuit, and is a question of law to be

11

determined from the facts. (*Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 164.) "A litigant will lack probable cause for his action either if he relies upon facts which he has no reasonable cause to believe to be true, or if he seeks recovery upon a legal theory which is untenable under the facts known to him." (*Id.* at pp. 164-165.) " 'In a situation of complete absence of supporting evidence, it cannot be adjudged reasonable to prosecute a claim.' [Citation.] Probable cause, moreover, must exist for every cause of action advanced in the underlying action. '[A]n action for malicious prosecution lies when but one of alternate theories of recovery is maliciously asserted . . . .' " (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 292, (*Soukup*).)

In the underlying lawsuit, Bell asserted claims for elder abuse of both the "financial abuse" variety (Welf. & Inst. Code, § 15610.07, subd. (a)) and the "care custodian" variety (Welf. & Inst. Code, §§ 15610.07, subd. (b), 15610.57, subd. (a)(1)). The latter claim required Bell to demonstrate the Lanes were "care custodians," within the meaning of Welfare and Institutions Code section 15610.17, who could be liable for depriving Bell of goods or services necessary to avoid physical harm to or mental suffering by Bell. (Welf. & Inst. Code, § 15610.07, subd. (b).) The Lanes' showing in opposition to defendants' anti-SLAPP motion demonstrated there was a " 'complete absence of supporting evidence' " for this claim (*Soukup, supra,* 39 Cal.4th at p. 292) because (1) they provided evidence that (if credited) would show they were never care custodians (or provided care for) Bell, (2) they provided evidence that (if credited) would show Bell's responses to discovery in the underlying action showed defendants knew before trial she had no evidence supporting those allegations, and (3) the court's order

12

granting nonsuit confirmed defendants produced no evidence supporting her claim for care custodian elder abuse.[4] This showing alone convinces us the trial court correctly found the Lanes produced admissible evidence that, if credited, would be sufficient to sustain a favorable judgment (*Robertson v. Rodriguez, supra,* 36 Cal.App.4th at p. 358) on the lack of probable cause element for the Lanes' current lawsuit alleging malicious prosecution. (See *Soukup, supra,* 39 Cal.4th at p. 292 ["Probable cause . . . must exist for every cause of action advanced in the underlying action. '[A]n action for malicious prosecution lies when but one of alternate theories of recovery is maliciously asserted . . . .' "].)

We are also convinced the trial court correctly found the Lanes produced admissible evidence that, if credited, would be sufficient to sustain a favorable judgment on the lack of probable cause element insofar as the Lanes' malicious prosecution action alleged defendants maliciously prosecuted claims for elder abuse of the "financial abuse" variety and intentional infliction of emotional distress. These claims asserted, as their underlying factual bases, that the Lanes (1) refused to provide Bell with reasonable

---

4       On appeal, defendants' only reference to her "care custodian" cause of action in her opening brief was the peremptory allegation that a jury "could have found" the Lanes qualified as care custodians under Welfare and Institutions Code section 15610.17, subdivision (y) (as an "other . . . person providing health services"), but without identifying what evidence defendants might have relied on for that assertion. The trial court's grant of nonsuit on that claim convinces us defendants in fact failed to produced evidence supporting her "care custodian" cause of action. Although defendants' *reply* brief attempts extensively to argue that her pleaded causes of action for elder abuse were viable even without proof the Lanes were care custodians, we decline to consider arguments raised for the first time in a reply brief. (See, e.g., *Save the Sunset Strip Coalition v. City of West Hollywood* (2001) 87 Cal.App.4th 1172, 1181, fn. 3.)

access to water, septic and utilities, (2) disconnected Bell from her water source, (3) turned off the electricity to her RV, (4) made verbal threats to Bell, (5) moved her RV and ripped off the deck and did not replace it, (6) caused Adult Protective Services to become involved when the Lanes attempted permanently to shut off Bell's electricity, and (7) moved her personal property from a storage shed into her trailer, causing significant damage to the personalty.[5]  The Lanes produced evidence in opposition to the anti-SLAPP motion that, if credited, would show each of those allegations were false and, more importantly, that defendants knew them to be false.[6]  The trial court correctly concluded this showing by the Lanes in opposition to defendants' anti-SLAPP motion

[5]     Bell's complaint also alleged the Lanes "refus[ed] to allow BELL to reside in the 'granny flat' " and "engag[ed] in behavior with the intent of intimidating her and/or forcing her to move off of the property."  However, defendants cited no evidence below, and did not cite any on appeal, that defendants possessed evidence a "granny flat" was ever constructed (or could have been approved for construction), a necessary predicate to her allegation that the Lanes "refused" to allow her to reside in such structure.  As to Bell's allegation that the Lanes "engag[ed] in behavior with the intent of . . . forcing her to move off of the property," the Lanes produced evidence in opposition to the anti-SLAPP motion that they never tried to force Bell off the Land, but did provide her with funds to help her move.  At trial, Bell admitted the Lanes never evicted her, she could have elected to move her RV back up to the upper lot but instead voluntarily chose to leave, and the Lanes gave her $25,000 (as an advance against her interest in the land) so that she could move.

[6]     Bell's trial testimony was that (1) she *did* have access to electricity, water and septic; (2) the Lanes did *not* shut off her water or electricity or disconnect her from the sewer; (3) the Lanes did *not* verbally threaten her; (4) she *voluntarily* moved her trailer from the upper lot to the lower lot because brush abatement would be required for her to remain on the upper lot, and the lower lot was already cleared; and (5) Adult Protective Services did visit the Lanes *but* (after conducting an inspection) said "everything seems to be in order" and "you are doing everything proper here."  Additionally, the Lanes' attorney averred that, in response to numerous forms of discovery propounded in the underlying action, defendants did not provide any evidence supporting these specified acts of misconduct charged in the complaint.

14

contained evidence sufficient to sustain a favorable judgment on the lack of probable cause element, insofar as the Lanes' malicious prosecution alleged defendants maliciously prosecuted claims for elder abuse of the "financial abuse" variety and intentional infliction of emotional distress, by showing Bell's claims in the underlying action "relie[d] upon facts which [she had] no reasonable cause to believe to be true . . . ." (*Sangster v. Paetkau, supra,* 68 Cal.App.4th at pp. 164-165.)

Defendants argue the Lanes' showing was inadequate because Bell averred that after she moved to the lower lot, her electricity would go out during storms, and contend there is no meaningful distinction between the allegations of her complaint in the underlying action (the Lanes refused to provide her with access to utilities and turned off her electricity) and her testimony (there were power outages during storms and she was disconnected from the temporary electrical supply when the certificate of occupancy for the Lanes' new home was issued).  Defendants make a similar argument that, because there was evidence her water supply was also subject to being interrupted by inclement weather, the allegation the Lanes refused to provide Bell with reasonable access to water and disconnected her from her water source were not known to her to be false.  However, a jury could infer there *is* a distinction between the facts Bell knew to be true (there were weather-caused *interruptions* to her water and electrical supplies over which the Lanes could have no control) and the allegations defendants actually leveled (the Lanes disconnected Bell's water source and turned off her electricity to force her from the

15

land).[7] We are satisfied the trial court correctly concluded the Lanes produced admissible evidence that, if credited, would be sufficient to sustain a favorable judgment on the lack of probable cause element under applicable anti-SLAPP standards.

*Malice:* The malice element examines the defendant's subjective intent in initiating the action, and includes, but is not limited to, actual hostility or ill will toward the plaintiff, but can also include initiation of proceedings primarily for an improper purpose. (*Sycamore Ridge Apartments LLC v. Naumann* (2007) 157 Cal.App.4th 1385, 1407.) Suits with the "hallmark" of an improper purpose include those in which the person initiating them does not believe his or her claim may be held valid, or are begun primarily because of hostility or ill will, or are initiated for the purpose of forcing a settlement that has no relation to the merits of the claim. (*Ibid*.)

The Lanes produced evidence that, if credited, would support a finding of malice under each of the foregoing categories. As to actual hostility or ill will, the Lanes produced evidence that Suppa accompanied Bell to Mr. Lane's offices unannounced and demanded to see him. During that meeting, Suppa heatedly stated Bell "was entitled to the house" the Lanes built, she wanted a "quarter of a million dollar damages for how [the

---

7    In defendants' reply brief, they argue at length that the Lanes' evidence concerning the falsity of the factual underpinnings for Bell's underlying complaint was contradicted by defendants' showing in connection with the anti-SLAPP motion and/or by Bell's trial testimony in the underlying action. Although these arguments may be grist for a jury at the ultimate trial on the malicious prosecution action, we cannot *weigh* the evidence (*Looney v. Superior Court, supra,* 16 Cal.App.4th at pp. 537-538) but instead only determine whether the Lanes' evidence, *if credited*, would meet their burden of proof. (*Wilcox v. Superior Court, supra,* 27 Cal.App.4th at pp. 823-825.)

16

Lanes] treated her," Suppa threatened to "ruin [the Lanes] financially . . . [and] personally," and Suppa threatened to "get you on elder abuse charges."[8]  Bell was present and smiling during Suppa's rant, and never disagreed with any of Suppa's statements.

In addition to the above evidence of actual hostility, there was some evidence that, if credited, would show the lawsuit was filed to extract a settlement having no relation to the merits of Bell's claims.  (*HMS Capital, Inc. v. Lawyers Title Co.* (2004) 118 Cal.App.4th 204, 218 ["Since parties rarely admit an improper motive, malice is usually proven by circumstantial evidence and inferences drawn from the evidence," and proof defendant demanded large settlement admissible on issue of malice and sufficient proof of malice to defeat anti-SLAPP motion].)  Prior to the filing of the lawsuit, Bell and the Law Firm demanded $235,000 for her interest in the land.  A jury could infer, from a comparison of this demand with the value of Bell's actual interest in the land recovered as part of her only successful claim (e.g. for partition), that the elder abuse and intentional infliction of emotional distress claims were prosecuted to extract a settlement having no relation to the merits of Bell's legitimate claims.

Finally, "malice can [also] be inferred when a party *continues* to prosecute an action after becoming aware the action lacks probable cause."  (*Daniels, supra,* 182

_____

[8]    Bell argues on appeal that Suppa's hostility cannot be imputed to the Law Firm. However, the Lanes' evidence would support such imputation because (1) Suppa told Mr. Lane (as well as Lane's attorney) that Suppa was Bell's attorney, (2) Suppa was "of counsel" to the Law Firm, (3) Suppa attended (apparently during the pendency of the lawsuit) a meeting to review the evidence and represented he and Trucchi were acting as Bell's attorneys, (4) Suppa attended a mediation on Bell's behalf, and (5) checks made payable for the benefit of Bell in the underlying action were deposited into Suppa's trust account.

Cal.App.4th at p. 226.) The Lanes averred defendants disclosed no evidence in discovery supporting her claims for elder abuse or intentional infliction of emotional distress, and nevertheless maintained those claims at trial after receiving explicit warnings the "claim for elder abuse . . . is frivolous, malicious and unconscionable," and would result in a malicious prosecution lawsuit.[9] We are satisfied the Lanes' evidence, if credited, would support the requisite finding of malice.

*Conclusion*: We conclude the Lanes produced admissible evidence that, if credited, would be sufficient to sustain a favorable finding on each of the three elements necessary to establish the tort of malicious prosecution. (*Daniels, supra,* 182 Cal.App.4th at p. 216.) The court correctly denied defendants' anti-SLAPP motion.

B. The "Advice of Counsel" Defense

Bell argues the motion should have been granted, at least as to Bell, because the Lanes did not "overcome" the affirmative defense of advice of counsel. When assessing an anti-SLAPP motion, a court may examine whether there are defenses to the pleaded claims that would defeat the plaintiff's claims *as a matter of law*. (*Peregrine Funding,*

_____

[9] Moreover, Bell and the Law Firm prosecuted a claim asserting the Lanes were in breach of contract for breaching the JVA, even though (1) Bell testified at trial that the Lanes "did everything that they were required to do under the [JVA]," and (2) Bell and the Law Firm knew before trial that it was *Bell* who had defaulted on her obligations because they stipulated at trial she had not paid $43,891 as her share of the common expenses under the JVA. Although defendants correctly argue this evidence is not directly relevant to the malicious prosecution action, because the malicious prosecution action does not allege the contract claim was maliciously prosecuted, it is potentially admissible to show defendants were willing to prosecute claims they knew to be without foundation. (Cf. *Hub City Solid Waste Services, Inc. v. City of Compton* (2010) 186 Cal.App.4th 1114, 1131-1134.)

18

*Inc. v. Sheppard Mullin Richter & Hampton LLP, supra,* 133 Cal.App.4th at pp. 675-676.) The advice of counsel defense can defeat a malicious prosecution action (*Sosinsky v. Grant* (1992) 6 Cal.App.4th 1548, 1556), but the defense is not available if the plaintiff "acts in bad faith or withholds from counsel facts he knew or should have known would defeat a cause of action otherwise appearing from the information supplied . . . ." (*Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 53-54.) The burden of proving this affirmative defense is on the party seeking to benefit by it (*ibid.*), and whether there was a full and fair disclosure of all of the facts to counsel is a question of fact. (*Weber v. Leuschner* (1966) 240 Cal.App.2d 829, 838.)

The defense of advice of counsel, as a peculiarly fact-driven inquiry, is not a defense that would defeat the Lanes' claims *as a matter of law*, and is therefore not the type of defense a party opposing an anti-SLAPP motion is required prima facie to overcome. Instead, Bell will at trial be required to carry her burden of proof that she fully and fairly disclosed all of the facts to her attorneys, and the Lanes will be entitled to conduct discovery into what Bell did (and did not) disclose to her counsel and to use such evidence to challenge her assertion that she fully and fairly disclosed all of the facts to her attorneys.[10]

---

[10] Bell's argument on appeal reveals the flaw in this claim. Bell argues the Lanes were required to produce evidence to "overcome" the advice of counsel defense, and the Lanes "did not offer any evidence to show that Bell had withheld or misrepresented anything" from her attorneys, but does not suggest how the Lanes could have obtained evidence about her communications with her attorneys to proffer in response to Bell's anti-SLAPP motion. Because her discussions would have been protected by the attorney-client privilege, at least until Bell interposed the advice of counsel defense (see, e.g.,

C. <u>Conclusion</u>

We conclude the trial court correctly denied defendants' anti-SLAPP motion and we therefore affirm the order.

DISPOSITION

The order is affirmed.  The Lanes shall recover costs on appeal.

McDONALD, J.

WE CONCUR:

BENKE, Acting P. J.

NARES, J.

---

*Transamerica Title Ins. Co. v. Superior Court* (1987) 188 Cal.App.3d 1047, 1053), it would appear to place an impossible burden on a party responding to an anti-SLAPP motion to "overcome" an advice of counsel defense.