Filed 10/15/15  Illingworth v. Garton CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| GODFREY ILLINGWORTH,<br><br>        Plaintiff and Appellant,<br><br>        v.<br><br>WILLIAM GARTON,<br><br>        Defendant and Respondent. | D066323<br><br><br>(Super. Ct. No. 37-2014-00006034-CU-DF-CTL) |

APPEAL from an order of the Superior Court of San Diego County, Joel R. Wohlfeil, Judge.  Affirmed.

John W. Howard for Plaintiff and Appellant.

Dawson & Ozanne, Brendan K. Ozanne and David A. Velijovich for Defendant and Respondent.

Defendant and appellant William Garton appeals the order denying his anti-SLAPP motion brought under Code of Civil Procedure section 425.16[1] to strike the

_____

[1]    All statutory references are to the Code of Civil Procedure.  Section 425.16 is commonly referred to as the anti-SLAPP statute.  (*Siam v. Kizilbash* (2005) 130

defamation[2] action filed against him by plaintiff and appellant Godfrey Illingworth. As we explain, we conclude defendant's anti-SLAPP motion was properly denied because we independently conclude defendant has failed to show the gravamen of plaintiff's defamation action involved protected conduct within the meaning of subdivision (e)(4) of section 425.16.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Plaintiff's Complaint*

At all times relevant, plaintiff was the executive director and one of the coaches of a soccer club located in San Diego County known as the Manchester Soccer Club (the club), which plaintiff alleges he founded years before. Plaintiff and defendant had known each other for about 30 years when, in or about 2000-2001, defendant joined the club as both a coach and its director of coaching.

In 2013, plaintiff heard from various third parties that defendant was seeking employment with another local soccer club and was recruiting other club coaches to join him at his new prospective club. Plaintiff's defamation action against defendant arose out

Cal.App.4th 1563, 1568.) SLAPP is an acronym for " 'strategic lawsuit against public participation.' " (*Jarrow Formulas*, *Inc. v. LaMarche* (2003) 31 Cal.4th 728, 732, fn. 1.)

2      We note defendant's anti-SLAPP motion stated he was moving to strike plaintiff's "complaint" and "all causes of action contained therein." However, we note the trial court in its order denying that motion did so *only* on plaintiff's defamation cause of action. In light of our decision in this case, we need not decide in this appeal whether the remaining causes of action in plaintiff's complaint are derivative of the defamation cause of action. (See *Lee v. Fick* (2005) 135 Cal.App.4th 89, 98 [concluding slander and interference claims were derivative of libel claim and thus were also subject to the anti-SLAPP statute].) We note, however, that in his moving papers filed in this court, defendant focused exclusively on his defamation cause of action and/or the defenses thereto, without regard to any of the other five causes of action in plaintiff's complaint.

of statements published by defendant "prior to, on or about October 17, 2013 and after" concerning plaintiff. In particular, the complaint alleges on that date defendant sent an email to four other coaches of the club containing myriad defamatory statements regarding plaintiff.

The email was attached as an exhibit to the complaint. The "subject line" of the email prepared by defendant stated, "Moving forward together." The first line of the email stated, "Hi guys, I know I have spoken to you all regarding next season, Warren [Barton, another club coach] has also followed up with conversations with you also I believe. This is a follow up email to keep you appraised [*sic*] of what is happening at present and what the immediate future can hold as we move forward together."

Defendant in his email further stated that he had "been offered the position of [d]irector of [b]oys at [a new club the] Sharks"; that Warren was "technical [d]irector" of the Sharks; that the opportunity at the Sharks was "a really good one, for both Warren and I, and of course you guys"; that the "Sharks have been around for a long time, they used to be a major soccer force, with a great boys and girls program," but that "they have had a gradual decline in recent years, especially on the boys['] side"; and that "[h]aving said that, they [i.e., the Sharks] have real ambition, a good leader . . . , some visionary board members, a great infrastructure, a huge rec program (2000+ kids), security of money in the bank, a plan to buy fields in the community, a fund for renting local high school fields, a real office, 3 full time admin personnel, a great tournament, a fundraising committee for field purchase, a great affiliation with Adidas, a great tryout set up, a college coordinator and an online college program free to all players, generally many

3

things that [the club] just cannot achieve to help fast track the club to where it needs to be."

Defendant in the email then goes on to discuss why he is leaving the club. After referring to plaintiff as his "partner," defendant noted that he lacked "trust" and "respect" for plaintiff as plaintiff allegedly continued to benefit from defendant's "hard work" in running the club. Defendant also stated his reputation had been tarnished by plaintiff as a result of plaintiff's "idiotic, unprofessional, egotistical, unethical, greedy ways," and noted he already felt "better" for stating in the email that he was moving on without plaintiff.

Defendant also stated in the email that the four coaches of the club would be "better away from [plaintiff]" as a result of plaintiff's "seriously inappropriate 'dealings,' " which reflected poorly on the club; that it was defendant's reputation as a player for the "real" Manchester United Club in England that "helped the club thrive"; and that if given the chance, plaintiff would merely " 'pimp' the club to bleed it dry of money for [plaintiff's] own benefit." Defendant stated he was telling the four coaches these things "because [plaintiff] will be trying to take the kids from your teams with him"; plaintiff will "lie to them, bad mouth you and me, denigrate you as a coach and person, denigrate the Sharks['] program, and go all out to promote himself [and two other club coaches] as the greatest thing out there . . . . You should have your own ammunition ready, promote yourself and your worth, and you can tell your parents and kids of the great opportunity that is available at the Sharks, using the info I mentioned earlier [in the email]."

The email then goes into more detail regarding why it was important for the coaches to move their team from the club to the Sharks: "In year one (2014) it is

4

essential that we can bring our teams with us, or at least a majority of the team. [¶] For obvious reasons, they need to be able to encompass us into their budget by using our teams/players as the initial financial support for our salaries. [¶] Understandable in every respect. [¶] If teams need 'fillers' to make the team fly then obviously there will be that opportunity. There will also be opportunities for additional teams should they present themselves. And additional earning potential, through camps, clinics and other programs. [¶] . . . [¶] You can begin to get the message out to your teams/parents. Be excited by the prospect, I truly am, they will feed off your excitement."

Defendant then discussed the opportunities, or lack thereof, that would be available to the club coaches if they stayed or went with plaintiff, who according to defendant was then either trying to buy defendant out or was seeking to make his own move to another local soccer club. Defendant stated that the "Sharks opportunity" was "by far a better home for a stable, secure, ambitious future for all our players"; that the four coaches should ask their players' parents to give each of them "one year" to prove that moving to the Sharks was the "correct move"; and that "[g]oing with [plaintiff would] be a pure gamble in every way," as plaintiff was "poison" and was "financial[ly] dishonest[]."

The email concluded by noting that the "plan" was to finish "this year as normal"; that defendant was planning an "invitational (bring a friend event) in December for all teams"; and that defendant was thankful to the four coaches for their "support" and "loyalty," which was "worth everything" to defendant.

Plaintiff in his complaint alleged that as a result of the email, the club by January 2014 "had lost all but five of its teams and almost all of the players and coaches moved

5

from [the club] with [d]efendant or to a different soccer club. As a result, [the club] was forced to cease operations, with [p]laintiff then searching for alternate employment."

As relevant here, plaintiff in his defamation action alleged that defendant made the defamatory statements in the email, including accusing plaintiff of "financial dishonesty," as "justification" for defendant's decision to leave the club and to recruit the club coaches also to leave the club and take their players and teams with them to the Sharks, where they would all be better off. Plaintiff further alleged that defendant knowingly and purposely published these defamatory statements, which defendant knew were false, with the intent to cause plaintiff harm; that such defamatory statements caused plaintiff harm in his "business, trade, profession and occupation as they directly related to [plaintiff's] ability, integrity and honesty in his role as the [e]xecutive [d]irector of the [club]"; and that as a result of such statements, plaintiff suffered monetary loss and harm to his reputation and was entitled to punitive damages.

B. *The Anti-SLAPP Motion*

As relevant in this appeal, defendant in his anti-SLAPP motion argued plaintiff's action was "based entirely on statements contained in [the] email . . . ." Defendant argued the anti-SLAPP statute applied because the statements in the email involved a communication made in connection with the " 'public interest.' " Defendant further argued the email to the four other coaches "bore on [the] dishonest acts" of plaintiff that allegedly "jeopardized the continuing viability of an organization responsible for the correct training and safety of children, a clear matter of public interest" within the meaning of the law. Because plaintiff could not show a probability of prevailing on his defamation cause of action, including because the statements in the email were

6

privileged, allegedly constituted nonactionable opinions and were in any event, allegedly true, defendant argued the court should grant his motion.

Defendant filed a declaration in support of his anti-SLAPP motion. In his declaration, defendant stated under penalty of perjury he sent the email "to only four people all of whom were coaches with the [c]lub and affiliated with the [c]lub." He did so because he "wanted to explain why [he] was exploring other options outside the [c]lub and to see if [he] could depend on their support in the litigation [he] feared would follow." Significantly, defendant also stated the "things" he said in the email "were private and [he] did not expect that they would be shared with anyone . . . ." Ultimately, defendant stated he was able to negotiate a " '[s]eparation [a]greement' " with the club, which he included as an exhibit to his declaration.

In opposing defendant's anti-SLAPP motion, plaintiff argued the purpose of the email was not to help the club or its players because otherwise defendant would not have stated in the email his plan was to play out the year as "normal." In addition, if the email was to help the club, plaintiff argued defendant would not have attempted to convince the four coaches to leave the club and join defendant's new club, the Sharks, which clearly would hurt the club. Thus, plaintiff argued defendant's purpose in sending the email was to benefit defendant's "personal and financial interests" with respect to defendant's move to the Sharks.

Plaintiff in support of his opposition submitted his own declaration and the declarations of Robert Turner and Denis Sweeney. Plaintiff also submitted evidentiary objections to defendant's declaration filed in support of defendant's anti-SLAPP motion.

7

Defendant on or about June 26, 2014 replied to plaintiff's opposition. Defendant's reply included rebuttal declarations from defendant, Darrell Johnson and Andrew Forth, as well as evidentiary objections to the three declarations plaintiff filed in support of his opposition.[3] The record shows the court ruled on plaintiff's evidentiary objections but *not* on defendant's evidentiary objections. In addition, the record shows plaintiff did not object to any of the evidence included by defendant in the rebuttal declarations.[4]

C. *Ruling on the Anti-SLAPP Motion*

In its order denying the motion, the court ruled defendant had made a sufficient showing that plaintiff's defamation action arose from conduct of defendant in furtherance of the exercise of his right to petition/free speech in connection with an issue of public interest, as provided in subdivision (e)(4) of section 425.16. The court nonetheless found plaintiff satisfied his burden to show a probability of prevailing on the merits of his defamation action.

---

[3]    According to defendant, on the same day he filed his reply, the court issued its tentative order denying his anti-SLAPP motion. At the hearing on the motion, however, the court stated it published its tentative on June 30, 2014 and had in fact reviewed defendant's reply.

[4]    One possible explanation for the court's failure to rule on defendant's evidentiary objections was the fact it possibly issued its tentative order on the same day defendant filed his reply, as defendant argued at the hearing on the motion and as he maintains in his brief filed with this court. We note, however, that defendant at the July 3, 2014 hearing on his anti-SLAPP motion did not address the court's failure to rule on his evidentiary objections. Because we independently conclude defendant did not satisfy his burden under prong one of the anti-SLAPP statute, we need not decide here whether his failure to raise this issue at the hearing and/or the failure of the court to rule on defendant's evidentiary objections constituted a waiver of said objections on appeal. (Compare *Reid v. Google* (2010) 50 Cal.4th 512, 526 [noting that written evidentiary objections filed before a *summary judgment* hearing are not waived on appeal despite trial court's failure to rule].)

8

In so ruling, the court found the statements in the email that plaintiff was "financially dishonest" and "unethical and unprofessional" to be actionable and not merely opinion. In addition, the court found defendant's contention that the email was a privileged, prelitigation communication carried "little weight"; that both parties presented evidence on the issue of whether plaintiff was financially dishonest; that defendant failed to show he was "imminently concerned" about the club; and that plaintiff had proffered evidence to make a showing of malice, inasmuch the "surrounding facts suggest [d]efendant sent the email based upon his own financial interest in taking as many coaches and players with him as possible."

At the hearing on defendant's anti-SLAPP motion, the court made some additional observations when explaining its decision to deny the motion. The court noted it "struggled" with whether defendant had satisfied his "burden on the first prong of the motion under the SLAPP statute." In fact, the court twice noted it had "reservations about whether the alleged statements made by the defendant[] were made in connection with a public issue." Nonetheless, the court ultimately "err[ed]" on the side of "public policy," which the court found required it to "broadly constru[e] the statute." In making this finding, the court further noted the "defense got the benefit of the court's discretion."

In finding plaintiff had proffered sufficient evidence to show a probability of prevailing on his defamation claim, the court observed:

"The court is mindful that from the defense's perspective all of the alleged defamatory statements are purely a function of opinion and are not actionable. There were a couple of statements that, from the court's perspective, could be considered factual

9

in nature. Maybe hybrid both factual and opinion. Ultimately, though, the trier of fact is going to have to sort that out. . . .

"There are limits to how much I can adjudicate at this point in time. There appears to be a question of fact as to whether the one or two statements that the court focused on as reflected in the tentative [order] are as alleged by the defense to be purely opinion or as alleged by the plaintiff to be purely factual. At some point in time, the trier of fact will sort this out. [¶] . . . [¶]

"Finally, I understand the defense's argument that plaintiff will have a difficult time showing damage but there does appear to be evidence to support the existence of the fact of damage. How much, I don't know if anybody including the plaintiff is in a position to say today but there does appear to be evidence of the fact of damage."

## DISCUSSION

### A. *The Anti-SLAPP Statute and Standard of Review*

Under section 425.16, subdivision (b)(1), a "cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."

Courts apply a two-pronged or two-step analysis when reviewing a challenge to an anti-SLAPP motion: "First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. The moving defendant's burden is to demonstrate that the act or acts of which the plaintiff

10

complains were taken 'in furtherance of the [defendant]'s right of petition or free speech under the United States or California Constitution in connection with a public issue,' as defined in the statute. [Citation.]" (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67 (*Equilon*); see *Martinez v. Metabolife Internat., Inc.* (2003) 113 Cal.App.4th 181, 186.) A defendant meets its threshold burden of demonstrating that a cause of action arises from protected activity by showing that the act or acts underlying the claim fit one or more of the four categories described in section 426.16, subdivision (e). (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88.) These categories include, as relevant here, a "catch-all" provision that protects "conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).)

" ' "A plaintiff cannot frustrate the purposes of the SLAPP statute through a pleading tactic of combining allegations of protected and nonprotected activity under the label of one 'cause of action.' " [Citation.] Conversely, a defendant in an ordinary private dispute cannot take advantage of the anti-SLAPP statute simply because the complaint contains some references to speech or petitioning activity by the defendant. [Citation.] [Thus,] it is the *principal thrust* or *gravamen* of the plaintiff's cause of action that determines whether the anti-SLAPP statute applies [citation], and when the allegations referring to arguably protected activity are only incidental to a cause of action based essentially on nonprotected activity, collateral allusions to protected activity should not subject the cause of action to the anti-SLAPP statute.' [Citation.]" (*Raining Data Corp. v. Barrenechea* (2009) 175 Cal.App.4th 1363, 1369; see *Young v. Tri-City Healthcare Dist.* (2012) 210 Cal.App.4th 35, 55.)

11

With respect to the second prong of the anti-SLAPP analysis, which we note is reached *only* if the defendant satisfies the first prong of that statute, the court then considers whether the plaintiff has met the burden of establishing a probability of prevailing on the claim(s) subject to the anti-SLAPP statute. (See § 425.16, subd. (b)(1); see also *Equilon*, *supra*, 29 Cal.4th at p. 67.) To satisfy the second step, the plaintiff must submit admissible evidence and make a prima facie showing of facts that would support a judgment in the plaintiff's favor if proved at trial. (*Monterey Plaza Hotel v. Hotel Employees & Restaurant Employees* (1999) 69 Cal.App.4th 1057, 1064 (*Monterey*).) The court in making the probability of prevailing determination should consider the pleadings and the supporting and opposing affidavits stating the facts on which liability is based. (§ 425.16, subd. (b)(2); *Monterey*, at p. 1064.)

We review independently whether a defendant showed a claim arose from protected activity within the meaning of the anti-SLAPP statute and, if so, whether the plaintiff showed a probability of prevailing on that claim. (*Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809, 823-824 (*Wilcox*), disapproved on another ground as stated in *Equilon*, *supra,* 29 Cal.4th at p. 68, fn. 5.)

B. *Subdivision (e)(4) of Section 425.16 and Analysis*

The anti-SLAPP statute does not define " 'an issue of public interest' " within the meaning of subdivision (e)(4) of section 425.16, and "it is doubtful an all-encompassing definition could be provided." (*Weinberg v. Feisel* (2003) 110 Cal.App.4th 1122, 1132 (*Weinberg*).) To qualify for protection under subdivision (e)(4) of section 425.16, the issue must be one of concern to a substantial number of people, not merely a private controversy of interest to the speaker and a relatively small, specific audience.

12

(*Weinberg*, at p. 1132.) At the same time, the issue must not be one of broad, amorphous public interest, but rather one identifiable in time and place, and the challenged statements must bear a significant relationship to the asserted public issue. (*Id.* at pp. 1132–1133.)

A public issue has been found where statements "concerned a person or entity in the public eye [citations], conduct that could directly affect a large number of people beyond the direct participants [citations] or a topic of widespread, public interest [citations]." (*Rivero v. American Federation of State, County and Municipal Employees, AFL–CIO* (2003) 105 Cal.App.4th 913, 924 (*Rivero*); accord, *Jewett v. Capital One Bank* (2003) 113 Cal.App.4th 805, 814 [noting "[a] public issue is implicated if the subject of the statement or activity underlying the claim (1) was a person or entity in the public eye; (2) could affect large numbers of people beyond the direct participants; or (3) involved a topic of widespread, public interest"].)

However, where the issue is of interest only to a limited but definable portion of the public such as a private group, organization, or community, "the constitutionally protected activity must, at a minimum, occur in the context of an ongoing controversy, dispute or discussion, such that it warrants protection by a statute that embodies the public policy of encouraging *participation* in matters of public significance." (*Du Charme v. International Brotherhood of Electrical Workers* (2003) 110 Cal.App.4th 107, 119, fn. omitted.)

In *Rivero*, the court concluded the statements made by a union in documents distributed to union members concerning a supervisor's alleged mistreatment of his eight-person staff of custodians was "hardly a matter of public interest." (*Rivero*, *supra*, 105

13

Cal.App.4th at p. 924.) The court noted that the supervisor previously received no public attention or media coverage, and the only individuals affected by the situation were the supervisor and his eight employees. (*Id.* at p. 924.) The union argued that any time a person criticizes an unlawful workplace activity, the statements concern a public issue. The court understandably rejected this argument, observing that if this were correct, "nearly every workplace dispute would qualify as a matter of public interest" and that "unlawful workplace activity below some threshold level of significance is not an issue of public interest, even though it implicates a public policy." (*Ibid.*)

In *Weinberg*, both the plaintiff and the defendant were token collectors and were members of a national association of about 700 token collectors. Both parties were also members of local token associations, and defendant was an officer in both the local and national associations. The defendant accused the plaintiff of stealing tokens at a token show, including some belonging to the defendant, and published such statements in a newsletter and letters sent to fellow token collectors. (*Weinberg*, *supra*, 110 Cal.App.4th at pp. 1127-1128.) The statements included calling plaintiff, a retired police officer, a "thief and chronic liar." (*Id.* at p. 1129.) The defendant also contacted a police officer and told the officer the plaintiff had a violent temper, people would fear for their lives if the plaintiff attended an upcoming token show, and the plaintiff had been stealing at several shows. (*Id.* at p. 1129.) In response to the plaintiff's complaint for defamation among other causes of action, the defendant filed an anti-SLAPP motion.

The court in *Weinberg* rejected the defendant's contention that the causes of action against him arose as a result of an issue of public interest within the meaning of subdivision (e)(4) of section 425.16, namely the defendant's warning others of the

14

plaintiff's suspected criminal activity. (*Weinberg*, *supra*, 110 Cal.App.4th at pp. 1126-1127.) In so doing, the court in *Weinberg* articulated "[a] few guiding principles . . . derived from decisional authorities" that we find helpful in our discussion here: "First, 'public interest' does not equate with mere curiosity. [Citations.] Second, a matter of public interest should be something of concern to a substantial number of people. [Citation.] Thus, a matter of concern to the speaker and a relatively small, specific audience is not a matter of public interest. [Citations.] Third, there should be some degree of closeness between the challenged statements and the asserted public interest [citation]; the assertion of a broad and amorphous public interest is not sufficient [citation]. Fourth, the focus of the speaker's conduct should be the public interest rather than a mere effort 'to gather ammunition for another round of [private] controversy . . . .' [Citation.] Finally, 'those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure.' [Citation.] A person cannot turn otherwise private information into a matter of public interest simply by communicating it to a large number of people. [Citations.]" (*Id.* at pp. 1132–1133.)

Relying in part on *Rivero*, the court in *Weinberg* concluded the defendant "failed to demonstrate that his dispute with plaintiff was anything other than a private dispute between private parties. The fact that defendant allegedly was able to vilify plaintiff in the eyes of at least some people establishes only that he was at least partially successful in his campaign of vilification; it does not establish that he was acting on a matter of public interest." (*Weinberg*, *supra*, 110 Cal.App.4th at p. 1134.)

Here, like the statements at issue in *Rivero* and *Weinberg*, the statements made by defendant in the email to four other club coaches concerning plaintiff did not concern a

15

matter of public interest within the meaning of subdivision (e)(4) of section 425.16. First, there is no evidence, nor does defendant assert, that plaintiff was a figure in the public eye. That plaintiff allegedly founded the club, coached there and was the club's executive director does not show or establish that he positioned himself at "the forefront of a particular public controversy in order to influence the resolution of the issues involved." (See *Weinberg*, *supra*, 110 Cal.App.4th at p. 1131.)

Second, the email, which defendant admitted was a private matter that he believed would be kept confidential, clearly affected only a small group—a few of the club's coaches. The fact they coached youth soccer players does not make what is a private controversy between private individuals into a public issue. That players and their parents as mere observers might find the dispute between plaintiff and defendant interesting, or might base their family's decision on which soccer club to join as a result of that dispute, does not turn the matter into a public issue. (See *Weinberg*, *supra*, 110 Cal.App.4th at p. 1132 [noting that " 'public interest' does not equate with mere curiosity"].)

Third, looking at the thrust or gravamen of plaintiff's defamation action, the focus of defendant's conduct as set forth in the email was not the public interest in the well-being or welfare of the club *or* its players. Indeed, at the time defendant wrote the email, he and another coach *already* had decided to leave the club for greener pastures. Rather, the alleged defamatory statements about plaintiff, when considered in context, suggest they were made by defendant in an attempt to recruit the other three[5] coaches to *also*

---

5  We say "three" here because although the email went to four club coaches, one of those coaches, Warren Barton, already had accepted a new position with the Sharks.

leave the club and join a rival soccer club, where defendant promised they would all be better off.

The subject line of the email, which stated, "Moving forward together," supports this conclusion. So too does the content of the email, including when defendant suggested that the coaches should have their own "ammunition ready" to counter what defendant stated would be plaintiff's "lie[s]," "bad[-]mouth[ing]" and "denigrat[ing]" of them; that they should be prepared to "promote" themselves to the "parents and kids of the great opportunity that is available at the Sharks"; and that they should be "excited" about joining the Sharks as their "teams/parents" will "feed off [their] excitement."

Defendant nonetheless contends that plaintiff's failure to appeal the court's *finding* that defendant met his burden under prong one means that issue is no longer in dispute in this appeal. We disagree. For one thing, plaintiff could not appeal a *finding* under the circumstances of this case where the court ultimately denied defendant's anti-SLAPP motion after ruling plaintiff proffered sufficient admissible evidence to satisfy his "minimal" burden under section 425.16 to show a probability of prevailing on his defamation action. (See *Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 291.) For another thing, as noted we apply a de novo standard of review on the issue of whether defendant satisfied his burden under prong one of the anti-SLAPP statute. (See *Wilcox*, *supra*, 27 Cal.App.4th at pp. 823-824.)

We also reject defendant's contention that the case of *Hecimovich v. Encinal School Parent Teacher Organization* (2012) 203 Cal.App.4th 450 (*Hecimovich*) is "dispositive" of the issue in this case. There, the court reversed the order denying the defendants' anti-SLAPP motion to the 20-page complaint alleging eight causes of action

17

brought by a volunteer coach (by profession, an attorney) of a fourth grade basketball team in an after school program. Based on the declarations of the parties, including plaintiff's and on plaintiff's verified complaint, the court in *Hecimovich* concluded the conduct on which the eight causes of action were based—plaintiff's fitness to coach young players—involved an issue of public interest, namely the "safety of children in sports." (*Id.* at p. 467.)

To support its conclusion, the court in *Hecimovich* relied on *Terry v. Davis Community Church* (2005) 131 Cal.App.4th 1534 (*Terry*), where the essence of the plaintiff's complaint was he was falsely accused of having an inappropriate sexual relationship with a minor female in his work as a church youth group leader. In response to complaints of parents, the church in *Terry* investigated the plaintiff and prepared a confidential report on the matter. The report was then shown, but not distributed, to about 100 interested people, who understandably were concerned about their own children and had sought this information from the church. (*Id.* at p. 1543.)

In response to the plaintiff's lawsuit alleging among other causes of action defamation and intentional infliction of emotional distress, the church, the church's pastor and church leaders filed an anti-SLAPP motion. In affirming the court's grant of that motion, the *Terry* court concluded the communications at issue in plaintiff's complaint involved a public issue, namely the protection of children from predators. (*Terry*, *supra*, 131 Cal.App.4th at pp. 1538-1539.) The *Terry* court rejected the plaintiff's contention that the case merely involved the "private relationship" between plaintiff and the girl: "The issue as to whether or not an adult who interacts with minors in a church youth program has engaged in an inappropriate relationship with any of the minors is clearly a

18

matter of public interest.  The public interest is society's interest in protecting minors

from predators, particularly in places such as church programs that are supposed to be

safe.  It need not be proved that a particular adult is in actuality a sexual predator in order

for the matter to be a legitimate subject of discussion."  (*Id.* at p. 1547.)

In contrast to the conduct at issue in *Hecimovich* and *Terry*, which involved

protected activity regarding the safety and protection of children, here, as we have noted,

the email by defendant (on which plaintiff's defamation action was primarily based) was

the culmination of a dispute between business "partners" who, for more than a decade,

successfully ran the club.  Ultimately, that relationship soured for a variety of reasons.

Defendant and another club coach in response decided to leave the club.  Before doing

so, defendant sent the email in an effort to recruit three other coaches to join them in

moving to the rival club.  The statements in the email, when viewed in this context, did

not involve the safety and protection of the club or the club's players, but instead were the

result of a private business relationship that was on the verge of breaking up.  We thus

discern no "public issue or an issue of public interest" within the meaning of subdivision

(e)(4) of section 425.16 with respect to the contents of the email sent by defendant.  (See

*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 76–77 [noting the fact that protected

activity may have triggered a cause of action does not necessarily mean the cause of

action arose from the protected activity].)[6]

---

6      As a result of our decision, we deem it unnecessary to address defendant's
remaining contentions including that the court allegedly erred when it found plaintiff
established under prong two a probability of prevailing on his defamation action.

19

DISPOSITION

The court's order denying defendant's anti-SLAPP motion is affirmed because defendant has failed to satisfy his burden under prong one of section 425.16, subdivision (b)(1) to show plaintiff's defamation action arose from protected activity.  Plaintiff to recover his costs of appeal.

BENKE, Acting P. J.

WE CONCUR:

HALLER, J.

IRION, J.

20